**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MIMEDX GROUP, INC. and SEAN MCCORMACK, | Case No. |
| Plaintiffs, | |
| v. | |
| SPARROW FUND MANAGEMENT LP, A/K/A "AURELIUS VALUE"; VICEROY RESEARCH; JOHN FICHTHORN; BR DIALECTIC CAPITAL MANAGEMENT, LLC; and DOES 1-10, inclusive, | |
| Defendants. | |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs MiMedx Group, Inc. ("MiMedx") and Sean McCormack ("McCormack," and together with MiMedx, "Plaintiffs") hereby complain and allege against Defendants Sparrow Fund Management LP a/k/a "Aurelius Value" ("Sparrow" or "Aurelius"); "Viceroy Research" ("Viceroy"); John Fichthorn ("Fichthorn"); BR Dialectic Capital Management, LLC ("Dialectic"); and Does 1-10, inclusive (collectively "Defendants") as follows:

## NATURE OF THE CASE

1.      This case involves a blatant "short and distort" market manipulation conspiracy against MiMedx by Defendants.  Defendants are noted short sellers—*i.e.*, stock traders betting that the price of the stock will fall—and/or have specifically admitted holding a short or bearish interest in MiMedx's stock.  While short-selling is an entirely legal pursuit when done according to the governing rules, regulations, and laws, a short-seller may not engage in fraudulent or manipulative conduct in an effort to ensure that its bet will pay off.  It is precisely that illegal conduct that Defendants here have engaged in.  In an all-out effort to ensure that they would profit from their negative investments, Defendants have maliciously disseminated materially

false, misleading and defamatory statements about MiMedx and its employees to shareholders and the investing public, intending to fraudulently manipulate the market for MiMedx's stock and to allow Defendants to reap enormous profits from the resulting price decline.

2.     The choice to specifically defame MiMedx employee Sean McCormack for the fraudulent conduct of other employees at his former employer, Advanced BioHealing ("ABH"), is particularly noxious.  McCormack is a twenty-year veteran of the United States Navy with a strong reputation as an ethical salesperson who, quite simply, did not engage in the fraudulent conduct at ABH with which Defendants have falsely maligned him.

3.     Defendants' attempts to profit at the expense of MiMedx, its employees (including McCormack), its customers, and its stockholders (including the numerous pensioners, retirees and other individuals who invest in the company through institutional funds) are wrongful and illegal under common-law concepts of libel, slander, defamation, and false light. Defendants' actions have also tortiously interfered with MiMedx's current and prospective business relations.  Defendants must be enjoined from further manipulative conduct and ordered to pay damages for their heinous conduct.

4.     As background, MiMedx is a global processor, marketer, and distributor of medical products.  MiMedx began trading publicly in 2008 and was listed on the NASDAQ exchange in 2013.  Recently, MiMedx was ranked #5 on Fortune Magazine's 2017 "Fastest Growing Companies" list.  MiMedx has also been consistently recognized by Georgia Trend Magazine as one of "Georgia's Top 100 Public Companies" and was honored by the Association for Corporate Growth as one of its "Georgia Fast 40" companies, recognizing the top 40 fastest-growing middle-market companies in the state.  As its business flourished, its stock price steadily rose from approximately $3/share to a high of approximately $17.50/share.

5.      In December 2016, MiMedx was forced to file suit against several former employees—who had been terminated for selling competitors' product to MiMedx's customers on the side—to enforce their non-compete agreements.  The former employees counter-sued, alleging that MiMedx fired them in retaliation for complaints about the company's purported business practices, including alleged "channel-stuffing" (a practice of inflating sales and revenue figures by distributing to retailers more products than a company is able to sell to the public). Thereafter, MiMedx began to notice an increase in the number of bearish trades in its stock (*i.e.*, bets that the stock price will decline; usually in the form of a short sale, the purchase of a "put" option, or the sale of a "call" option) piling up at a rate much higher than usual.  These traders evidently believed that the former employees' lawsuits against MiMedx would negatively impact its stock price.

6.      However, the former employees' allegations were invented simply to intimidate the Company into eliminating their non-compete agreements and paying a large settlement.  As MiMedx disclosed in several press releases, a robust internal investigation showed that the former employees' allegations were unsupported by any credible evidence.  Also, through the discovery process in those lawsuits, MiMedx obtained admissions from some of the litigants indicating that they did not have evidence to support their claims, and one litigant even withdrew his claims.  As a result, MiMedx's stock price continued to rise.

7.      When the price of a stock rises against a trader's short position, a phenomenon called a "margin call" can occur.  In the context of short selling, a margin call is when the entity who has lent stock to the trader so that the trader can short sell it—intending to purchase it back later for a lower price, returning it to the lender and pocketing the difference—requires the trader to put up additional money as collateral to cover his or her potential losses from the rising stock

price.  Rather than do so, many traders will exit their short position by repurchasing the stock, thereby causing the price to go even higher.  This can trigger a second, related phenomenon called a "short squeeze," which takes place when a large number of short sellers are forced to cover their positions in a small period of time.  The rising price of MiMedx stock therefore posed a significant threat to the trading positions of its short-sellers.

8.      Not coincidentally, to eliminate a possible margin call and/or short squeeze, the short sellers and those working with them (including Defendants) soon began an attack on MiMedx.  This attack took the form of a classic "short and distort" market manipulation campaign, aiming to bring MiMedx's stock price down.[1]  First, on or about September 15, 2017, Fichthorn—the founder of Dialectic, a hedge fund manager with an admitted "emphasis on adding value through stock selection in the short portfolio"—held a telephone call directly with a major MiMedx shareholder.  In this call, Fichthorn made multiple false and misleading statements concerning MiMedx's business practices and value as a company, which statements were designed to malign MiMedx's reputation and thereby manipulate the shareholders into selling his long position in MiMedx stock, resulting in profit for MiMedx's short-sellers, including Defendants.  Indeed, the shareholder soon sold over one million shares of MiMedx stock—nearly half of MiMedx's daily trading volume at that time.

9.      Less than a week later, on September 20, 2017, two purportedly anonymous internet posters using the pseudonyms "Aurelius Value" and "Viceroy Research" published false

---

[1]      Per the investing website Investopedia, a "short and distort" is: "An illegal practice employed by unethical internet investors who short-sell a stock and then spread unsubstantiated rumors and other kinds of unverified bad news in an attempt to drive down the equity's price and realize a profit."  http://www.investopedia.com/terms/s/shortanddistort.asp (last visited Sept. 28, 2017).  The Securities and Exchange Commission has stated that a "short and distort" scheme "is particularly insidious because it harms investors by distorting the information they use to make investment decisions;" *i.e.*, by manipulating the market.  https://www.sec.gov/news/press/2008/2008-64.htm (last visited Sept. 28, 2017).

and misleading articles about MiMedx on their respective websites.  Viceroy later followed up with several other articles.  Notably, these articles contained many of the same types of false and misleading statements made by Fichthorn just days earlier.  Aurelius, in particular, echoed some of the same false and misleading statements in his article as Fichthorn had made in his presentation to MiMedx's shareholder, evidencing that the two were acting in concert.  Aurelius and Viceroy then published their own articles, and re-posted or re-published each other's article(s), on their respective Twitter pages.  Like the statements made by Fichthorn, the statements made by Aurelius and Viceroy were designed to manipulate shareholders into selling MiMedx stock and thereby to drive MiMedx's stock price down, allowing the short sellers to maintain a profit from their short positions.

10.     Defendants are not journalists, but profiteers and market manipulators with admitted short interests in MiMedx's stock.  Through their commercial speech detailed below, Defendants made numerous false and misleading statements, intending solely to benefit themselves by preventing margin calls and a possible short squeeze and, further, producing large profits for themselves and MiMedx's other short-sellers at the direct expense of the company and its interest-holders (to say nothing of the reputational harm inflicted on Plaintiffs).  Defendants' false and misleading commercial speech is not protected by the First Amendment.

11.     MiMedx has a moral and a fiduciary obligation to police and combat the dissemination of false, misleading and injurious statements made by stock traders seeking solely to enrich themselves at the expense of MiMedx, its employees, and its shareholders.  Stock market analysts, such as Joseph Munda with First Analysis Securities Corp., follow negative online commentary regarding the company and may be influenced by the same.  Thus, MiMedx has enforced, and will continue to enforce, its right to be free of such false, misleading and

injurious statements against whomever necessary and by whatever means necessary, including by resort to the courts.  In this respect, MiMedx is particularly aware that a frequent component of "short and distort" campaigns is the filing of meritless "follow-on" litigation against the subject company, seeking to further manipulate the stock price in a negative manner.  Whether as a plaintiff or defendant, MiMedx will enforce its legal rights to the full limit of the law against those involved with or abetting such "short and distort" efforts.

12.     Given the foregoing, Plaintiffs seek damages for Defendants' wrongful and defamatory conduct, including reasonable attorneys' fees as permitted by law, as well as injunctive relief to prevent Defendants from further disseminating their false and misleading statements about Plaintiffs.

## PARTIES, JURISDICTION AND VENUE

13.     Plaintiff MiMedx Group, Inc. is a Florida corporation with its principal place of business at 1775 West Oak Commons Ct. NE, Marietta, GA 30062.  MiMedx is publicly-traded on the NASDAQ exchange under the ticker symbol MDXG.

14.     Plaintiff Sean McCormack is an individual employed by MiMedx and is domiciled in the State of Florida.

15.     Upon information and belief, Defendant Sparrow Fund Management LP is a Delaware limited partnership with its principal place of business at 101 Park Avenue, 33rd Floor, New York, NY 10178.  Sparrow is a hedge fund manager and/or investment advisory firm, and under the pseudonym "Aurelius Value," its principals and/or employees are engaged in the publishing of supposed "research" about publicly-traded companies on its website, http://aureliusvalue.com/.  Based on the prefatory language in its writings as "Aurelius Value,"

Sparrow appears to write solely about companies in which it or its fund(s) have a short position. Sparrow's partners are citizens of the State of New York and the State of California.

16.     Upon information and belief, Defendant Viceroy is an individual engaged in the publishing of supposed "research" about publicly-traded companies on its website, http://viceroyresearch.org/. Viceroy also appears to write solely about companies in which it has a short position. Viceroy is not a citizen of the State of Georgia or the State of Florida. Viceroy conceals its true identity and domicile, but MiMedx will amend this complaint to state the same once discovered.

17.     Defendant John Fichthorn is the co-founder and a manager of Defendant Dialectic. Upon information and belief, Fichthorn owns property in the state of New York and, as set forth below, directed his defamatory comments about MiMedx to a New York resident who is a MiMedx shareholder. Fichthorn is not a citizen of the state of Georgia or the State of Florida.

18.     Upon information and belief, Defendant BR Dialectic Capital Management, LLC is a Delaware limited liability company with its principal place of business at 119 Rowayton Ave., 2nd Fl., Norwalk, CT 06853. BR Dialectic relies on the registration of B. Riley Capital Management, LLC, an SEC registered investment adviser. None of Dialectic's members are citizens of the State of Georgia or the State of Florida. Dialectic purports to be an "investment adviser . . . with an emphasis on adding value through stock selection in the short portfolio." Dialectic is managed and/or owned by Defendant Fichthorn, a citizen of New York, and the conduct of Fichthorn outlined in this Complaint was specifically intended to benefit Dialectic.

19.     MiMedx is unaware of the true names and capacities of the defendants named herein as Does 1 through 10, inclusive, and therefore names said defendants by such fictitious names.  MiMedx will seek leave to amend this complaint when the true names and capacities of said defendants have been discovered.  MiMedx is informed and believes, and thereon alleges, that each of said fictitiously named defendants is responsible for the acts which resulted in the harm to MiMedx alleged herein.

20.     Upon information and belief, each of the Defendants herein was the agent and/or co-conspirator of each of the remaining Defendants in the "short and distort" scheme alleged herein, and in doing the things alleged herein, was acting within the course and scope of that agency, employment, and/or conspiracy.

21.     This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332, as the parties are entirely diverse of citizenship and the amount-in-controversy exceeds $75,000.00.  Specifically, as a result of the market manipulation outlined in this Complaint, MiMedx's stock price has fallen significantly, resulting in hundreds of millions of dollars of lost value to the company and shareholders.  Additionally, both Plaintiffs have suffered significant reputational and other damages in excess of the jurisdictional minimum as a result of the defamatory conduct described herein, including damages suffered by virtue of the reticence of current/prospective partners and customers to do business with Plaintiffs.

22.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3).

## GENERAL ALLEGATIONS

### Dialectic & Fichthorn

23.     Fichthorn, the co-founder of Dialectic, has been interested in short-selling MiMedx stock for some time, and in this capacity had several conversations with MiMedx

concerning MiMedx's business practices in August 2017; including specifically on August 8, 2017 and August 11, 2017.

24.     On or about September 15, 2017, Fichthorn had a telephone call (the "September Call") with a major MiMedx shareholder in which he made several false and misleading claims about the company, intending to manipulate the shareholder into selling his stock and thereby advance his own short interest in MiMedx's stock, and/or the Dialectic funds' short interest in MiMedx's stock.

25.     The theme of Fichthorn's talking points to MiMedx's shareholder in the September Call was that the company was engaged in fraudulent channel stuffing, as per the false allegations leveled by MiMedx's former employees and summarized above.  Fichthorn presented his comments to the shareholder as fact, although most were drawn from those former employees' false and unsubstantiated allegations.   Incredibly, Fichthorn represented to the shareholder with no hesitation that "this is definitely a revenue fraud situation," that the practices he described "could be a jailable offense for the CEO," and that "this situation will end up with some MiMedx employees being dragged away in handcuffs."

26.     Fichthorn also expressly compared MiMedx to a company called Arthrocare, which following a lengthy investigation saw its executives convicted or enter guilty pleas upon allegations of channel stuffing.  He told the shareholder to think about the "Arthrocare CEO who went to jail for similar stuff."

27.     Fichthorn's unambiguous representations of a current state of facts (*e.g.*, "this is definitely a revenue fraud situation") were literally false and defamatory about the company.  Further, to the extent any of Fichthorn's statements could be construed as opinions regarding future events (*e.g.*, that "this situation will end up with some MiMedx employees being dragged

away in handcuffs"), they were still deceptive, misleading, and cast MiMedx in a false light because they were based on falsehoods and unsupported allegations.

28.    Specifically, Fichthorn made a number of false statements on the September Call that "in December 2015 MiMedx stuffed over $10 million" of product, or that certain MiMedx employees instructed others "to stuff channel in 12/15." Fichthorn represented these statements to the shareholder as facts, but they were not true.

29.    Fichthorn also made several blatantly misleading statements concerning MiMedx's business practices with respect to consignment sales. Consignment sales are when a manufacturer or seller releases product to be stored by a buyer until the buyer has need for the product, at which point the buyer will actually purchase the product; for example, when a medical products manufacturer releases product to be stored by hospitals in the event they are needed to be purchased for use on a patient. MiMedx has historically allowed hospitals and other entities to store product on a consignment basis, which is entirely proper and stands in stark contrast to channel stuffing because the seller does not receive a purchase order or recognize revenue until the actual purchase is made by the buyer. Fichthorn was fully aware of and understood MiMedx's consignment sale model because the model was explained to him in at least one of his multiple conversations with MiMedx's executives—including, specifically, the conversation that took place on August 11, 2017.

30.    Nevertheless, on the September Call, Fichthorn advised MiMedx's shareholder that "a number of VA [Department of Veterans Affairs] people" and/or other doctors had confirmed that they were shipped MiMedx product without purchase orders. Fichthorn also read aloud a purported e-mail exchange between someone at the "American Vet Association" and a MiMedx employee, wherein the sender informed the MiMedx employee that he had received a

box from MiMedx "without a purchase order" and asked for clarification as to why the box was sent. Fichthorn's clear implication was that MiMedx was engaged in channel stuffing. However, Fichthorn knew that shipping product without a purchase order is not channel-stuffing, particularly since MiMedx had explained the consignment sale model to him. Yet Fichthorn made no mention of consignment sales to the shareholder during the September Call.

31.      Fichthorn also made several other false and/or misleading statements apparently in support of a channel-stuffing or a general fraud theory, including that:

     a.     He "talked to lots of Texas and Florida distributors who stuff product for MiMedx." As discussed above, this statement is false, as no distributors "stuff product for MiMedx" and therefore no distributors could or would have represented as much to him;

     b.     Mark Brooks owns 25 different distribution companies in Richardson, Texas which all distribute MiMedx product. In fact, Brooks owned only one company that to which MiMedx sold product, CPM Medical Management, LLC ("CPM"), and that arrangement was terminated in 2015. Further, if CPM re-sold MiMedx's products to sub-distributors, MiMedx would not necessarily have been made aware—nor would this have been unlawful—although MiMedx's agreement with CPM did seek to prohibit such conduct);

     c.     Bill McLaughlin, a "paid consultant to MiMedx," had "6 different business cards." Yet, McLaughlin is not a paid consultant to MiMedx, and whether he has multiple jobs or business cards is hardly evidence of any malfeasance by MiMedx;

     d.     A company called Fuse Medical ("Fuse") is a "public distributor" of MiMedx and is paying doctors in Fuse stock. To the contrary, MiMedx has never had a relationship with Fuse, and that company's practices are irrelevant to MiMedx's practices;

     e.     Fuse's claimed headquarters address is a FedEx Office. This is false as well. A simple Google search shows that while there is a FedEx Office at the same street address as Fuse's headquarters, it has a different suite number. In any event, MiMedx has no relationship with Fuse, so this is an irrelevant accusation;

     f.     "40 doctors have shares of MiMedx, which is a conflict of interest." MiMedx has not granted shares to 40 doctors, rendering this statement

intentionally misleading, at best.  To the extent that any doctors obtained shares in MiMedx on the open market, this is entirely out of MiMedx's control and would not support the implication of wrongdoing in Fichthorn's statement.  In any event, there is no stated indication that the allegedly identified doctors were responsible for buying decisions such that their stock ownership might constitute a conflict of interest; and

g.   One of MiMedx's former employees has a list of "120 [other] former employees" with knowledge of channel stuffing.  This allegation is clearly false, as if the employee had such a list he would have had to produce that list in litigation, yet no such list was ever produced.

32.     Finally, Fichthorn implied that MiMedx's investigation into the channel-stuffing allegations was biased and inadequate, when he knew this was not the case.  The purported basis of his innuendo was that the founder of the "local Atlanta law firm" involved in the MiMedx investigation was once on the board of Matria Healthcare ("Matria"), the company at which MiMedx's CEO formerly worked.  Fichthorn did not state who the "founder" or the law firm was, but it appears he was referring to former Governor of the State of Georgia Carl E. Sanders, and the law firm of Troutman Sanders LLP.

33.     To be clear, Troutman Sanders LLP is an international law firm founded in 1897, and has more than 650 attorneys.  Governor Sanders was not a founder of the firm; rather, his firm Sanders Ashmore & Boozer was merged into Troutman Sanders LLP in the 1970's.  Further, Governor Sanders sat on Matria's board from 1996 to 2006 and passed away in 2014, while the channel-stuffing investigation occurred in 2016-17.  Essentially, Fichthorn sought to tarnish MiMedx's investigation by casting aspersions upon the honor of a dead former governor who could not possibly have had any role to the investigation.  Indeed, the foregoing facts are all publicly verifiable and significantly undercut Fichthorn's suggestion of impropriety, but Fichthorn conveniently omitted all of them from his the September Call with MiMedx's shareholder.  This omission was intentionally designed to mislead MiMedx's shareholder into

12

believing that the channel-stuffing investigation was tainted—when Fichthorn knew it was not—and to manipulate the shareholder into selling his stock in MiMedx, which would benefit Fichthorn and/or Dialectic.

34.     Fichthorn's omissions and his false and misleading statements had their intended effect.  As a direct result of the September Call, the MiMedx shareholder sold approximately one million (1,000,000) shares of MiMedx stock on the open market.  A sale of one million shares constitutes close to <u>half</u> of the stock's average daily trading volume over the past 50 days.

### Sparrow/Aurelius

35.     Several days after Fichthorn's call with the MiMedx shareholder, on September 20, 2017, an author hiding behind the pseudonym "Aurelius Value" published a false and defamatory article about MiMedx (the "September 20 Article").

36.     Upon information and belief, Aurelius Value is actually one or more of Sparrow's partners or employees, posting under a pseudonym for the benefit of themselves and/or Sparrow (hereinafter, Sparrow shall be alternately referred to as "Aurelius").

37.     In the preface to the September 20 Article, Aurelius expressly admitted as follows:

> You should assume that as of the publication date of his reports and research, Aurelius and possibly any companies affiliated with him and their members, partners, employees, consultants, clients and/or investors (the "Aurelius Affiliates") **have a short position in the stock** (and/or options, swaps, and other derivatives related to the stock) and bonds of MiMedx.  They therefore stand to realize significant gains in the event that the prices of either equity or debt securities of Mimedx [sic] decline.  Aurelius and the Aurelius Affiliates intend to continue transactions in the securities of Mimedx for an indefinite period after his first report on a subject company at any time hereafter regardless of initial position and the views stated in Aurelius' research.  Aurelius will not update any report or information on this website to reflect such positions or changes in such positions (emphasis added).

(A copy of Aurelius's September 20, 2017 article is attached as Exhibit "A.")  Thus, Aurelius admitted that it stood to benefit from a decline in MiMedx's stock price.

38.     Echoing Fichthorn's talking points in the September Call, Aurelius's article was a classic "short and distort" effort to damage the company's reputation in the public eye and negatively impact its stock price, all so that Aurelius or the "Aurelius Affiliates" could profit from their short position(s).    Aurelius, like Fichthorn, compared MiMedx negatively to Arthrocare, suggesting that MiMedx's executives should suffer the same fate.  *See supra* ¶ 26. Indeed, there are numerous instances of blatantly false and/or misleading statements in the article, some of which exactly mirror the statements made by Fichthorn.

39.     First, Aurelius purported to provide evidence of the channel-stuffing allegations by, among other things, implying that it identified specific locations in which excess MiMedx inventory was being stored.  Aurelius falsely stated that there is a "large network of other sales entities that report storing and distributing MiMedx product, often from residential homes or obscure locations, especially in Texas."  Notably, Fichthorn also tied MiMedx's alleged channel-stuffing activities to Texas, with a similar lack of substantiation.  *See supra* ¶ 31(a).

40.     The primary example cited by Aurelius involves a MiMedx distributor called Arthomed.  Aurelius stated that Arthomed's main office is a "residential home on the outskirts of Boca Raton," Florida, including a "Google Street View" screenshot of the office which makes it appear to be someone's personal residence.  Aurelius also included a sampling of other "Google Street View" screenshots depicting other small offices or homes.  The clear implication was that MiMedx is using small homes and offices—presumably, as opposed to large industrial warehouses—as outlets for channel-stuffing activity.

41.     Aurelius neglected to mention, or did not bother to engage in any sort of reasonable investigation to discover, several key facts that would have correctly explained these observations about Arthomed's offices.  Aurelius's refusal to investigate the actual facts—as opposed to lobbing unsubstantiated allegations—demonstrates not only an intent to mislead but an intent to profit off of the commercial speech in question, rather than provide useful information to the public as a journalist would.

42.     One such fact is that Arthomed's office is located in Delray Beach, Florida, a city in which many businesses operate out of houses due to its unique zoning ordinances. Arthomed's office holds OSSHAD (Old School Square Historic District) zoning status, as do many of the other businesses in the area that are operated out of houses.  This zoning status is considered quite valuable and is a prime reason that Arthomed's office is located where it is. Another fact is that Delray Beach is not "on the outskirts" of Boca Raton—it is its own city with a population nearly as high as that as Boca Raton, and is located miles away.  Finally, Arthomed is registered with the Food and Drug Administration ("FDA") to store and distribute amniotic membrane at its Delray Beach location.  As a registered entity, Arthomed is subject to regular audits by the FDA at this location, and not once has the FDA ever found regulatory action warranted based on any significant objectionable conditions or practices.  These facts are easily ascertainable by resort to public sources, but Aurelius specifically declined to discover or state them, so as to present Arthomed in a false light, cast doubt upon MiMedx's business practices, and falsely imply that it was engaged in illegal activity.

43.     Second, Aurelius purported to identify "[u]ndisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider," which present "channel stuffing and kickback risks."  This is false, as none of

15

MiMedx's distributors are now, or have historically been, owned by MiMedx employees or controlled by insiders (including Jerry Morrison, who has never been a MiMedx "insider," and SpineLogix, which has never been a MiMedx distributor). Aurelius's related statement that MiMedx and CPM have an "undisclosed OEM agreement" for CPM to sell MiMedx products under its own trademark is also not true (nor is it wrongful for MiMedx to sell its products under other trademarks in any event). Finally, to the extent Aurelius states that a former MiMedx sales representative "corroborated the allegation" that MiMedx employees had stored "excess product," notably absent from this statement is any indication that MiMedx management was aware, or if management was aware, that nothing was done about it. Indeed, research would have revealed that MiMedx has terminated employees for engaging in such conduct when discovered. Nor is there any indication that MiMedx improperly recognized revenue in connection with this "excess product" (the essence of the channel-stuffing allegation).

44. Third, Aurelius implied that MiMedx has made misrepresentations to investors, including specifically by stating that it does not "directly sell to or distribute any of [its] products through PODs [physician-owned distributors]." Aurelius purported to have discovered that contrary to MiMedx's representation, "MiMedx product is still sold through PODs," and claimed that PODs are "inherently suspect under the anti-kickback statute." However, Aurelius knew that MiMedx's statement was in fact true.

45. Indeed, the example raised by Aurelius involves a company also cited by Fichthorn: Fuse. Aurelius alleged that Fuse "was created through a reverse merger of various physician owned partnerships," and qualified as a POD because "40 podiatrists across the country . . . exchanged their partnership interests for membership interests in [Fuse], with the doctors typically paying $100 along with a contribution of 'general consulting services.'" In

nearly the same breath, however, Aurelius stated that Fuse is not supplied by MiMedx, but by CPM. Aurelius therefore did not and could not show that MiMedx's statement that it does not "directly sell to or distribute any of [its] products through PODs" was false. Instead, Aurelius carefully crafted its statement that MiMedx product is "sold through PODs" in a manner specifically designed to imply a falsehood. Notably, Aurelius's allegations regarding Fuse again closely matched those talking points followed by Fichthorn (*e.g.*, that "40 doctors own shares in MiMedx, which is a conflict of interest."). *See supra* ¶ 31(f).

46. Fourth, Aurelius included a variety of allegations in its article concerning Bill Cochrane, a former MiMedx employee who now performs consulting services for distributors. Aurelius described a meeting between Cochrane and "an investigator from another investor" in which the investigator was attempting to speak to a representative of CPM—a company with which MiMedx has not even done business for years—but was instead "referred to" Cochrane.

47. Aurelius's only apparent use for the meeting was to attempt, unsuccessfully, to undercut a statement allegedly given by MiMedx to its investors ("MiMedx told another investor that CPM has not generated any revenue for MiMedx since 2015 [true], but Mr. Cochrane estimated that the business has over 100 employees and holds inventory that includes MiMedx product. . .").[2] In characterizing the meeting this way, Aurelius intentionally and manipulatively omitted to mention facts conveyed to it that specifically rebut allegations made elsewhere in the article: specifically, that: (i) when asked about the former employees' lawsuits against MiMedx, Cochrane stated that he did not believe their allegations were true; (ii) when asked about channel stuffing, Cochrane categorically refuted such allegations, explaining that MiMedx's distributors,

---

[2] Of course, while Cochrane's statement did not even facially rebut the claims purportedly made by MiMedx, Cochrane does not work for MiMedx, so Aurelius's reliance on Cochrane to rebut MiMedx's statements was misplaced in any event.

including CPM, engaged in bulk purchases at various times, all of which were entirely legitimate; and (iii) Cochrane felt that MiMedx's CEO had built an honest and well-reputed business.  Upon information and belief, Aurelius specifically omitted these facts because its goal was to manipulate the public into thinking that MiMedx was engaged in wrongdoing, and the facts did not fit its chosen narrative.

48.     Aurelius does not enjoy First Amendment protection, as its admitted short position in MiMedx stock renders this speech commercial in nature, particularly given the statements made therein.  Aurelius is not, in other words, a journalist serving the public good, but a profiteer seeking to benefit at the hands of MiMedx's shareholders by manipulating MiMedx's stock price.  Moreover, the First Amendment does not give a person the right to publish misleading statements that place another person or entity in a false light in the public eye.

**Viceroy**

49.     On the same date as Aurelius, September 20, 2017, Viceroy also published an article about MiMedx.  Viceroy then published follow-up articles on September 26, 2017 and October 2, 2017.  Viceroy expressly admitted, in a preface to each article, as follows:

> As of the publication date of this report, you should assume that the authors have a direct or indirect interest/position in all stocks (and/or options, swaps, and other derivative securities related to the stock) and bonds covered herein, and **therefore stand to realize monetary gains in the event that the price of either declines**. The authors may continue transacting directly and/or indirectly in the securities of issuers covered on this report for an indefinite period and may be long, short, or neutral at any time hereafter regardless of their initial recommendation [emphasis added].

(Copies of Viceroy's September 20, 2017, September 26, 2017, and October 2, 2017 articles are attached as Exhibits "B," "C," and "D" respectively.)

50.     In similar fashion to Aurelius's article, and akin to Fichthorn's communications to MiMedx's shareholder, Viceroy's articles contained numerous falsehoods, misleading

18

statements, and attempts to place MiMedx in a false light in the public eye.  The numerous actionable statements in Viceroy's "short and distort" articles can generally be categorized in three ways: (1) the employment of former ABH employees previously alleged to have been involved in kickback and bribery schemes at ABH, specifically including McCormack; (2) the channel-stuffing allegations leveled by MiMedx's former employees; and (3) purported misconduct, either relating to MiMedx's certifications to do business with certain government organizations or as alleged, but not proven, in other unrelated lawsuits.

*Kickback/Bribery Allegations Concerning ABH & Sean McCormack*

51.     One of the primary themes in Viceroy's articles concerned previous allegations of kickback and bribery at ABH—an entirely separate company from MiMedx, with different management and ownership.  Viceroy's main implication appeared to be that because in 2012 and after, MiMedx hired staff that previously worked for ABH's successor company, Shire Pharmaceuticals, LLC ("Shire"), MiMedx is masterminding a kickback/bribery scheme of its own.  This could not be further from the truth.

52.     One way in which Viceroy attempted to draw a connection between MiMedx and ABH was to purport to identify an "incestuous hiring policy" between the two companies, where MiMedx hired the former ABH employees and placed them in "senior employment positions." However, there is nothing "incestuous" about hiring employees from another company in the same industry (particularly since MiMedx did not actually hire any employees directly from ABH, but from Shire).  MiMedx vetted all of the former ABH employees it hired and found that none had been engaged in wrongful conduct at ABH, which Viceroy knew or would have found out had it done any reasonable investigation.  And contrary to Viceroy's statement, not a single former ABH employee is in a position above middle management at MiMedx.

19

53.     Viceroy then specifically suggested that MiMedx hired former ABH employee McCormack because of his alleged history of involvement in kickback and bribery schemes at previous employers, including ABH.   Viceroy stated that MiMedx's investors should be concerned about their investments given McCormack's involvement with the company, in a naked attempt to defame McCormack and manipulate those investors into selling their shares.

54.     However, Viceroy's statements concerning McCormack were highly misleading at minimum, and at times were flatly false and defamatory.   Among other things, Viceroy asserted that McCormack was an "instrumental figure" in the alleged scheme at ABH, which ultimately cost the company's successor, Shire, a significant sum in legal settlements.   Indeed, Viceroy stated that Shire was forced to pay a "$350m settlement" as a result of allegations brought against ABH under the False Claims Act ("FCA") (Viceroy also attributed a "$650m write-off" to the FCA claims, which is blatantly false in and of itself; Shire took that write-down for business reasons unrelated to the FCA claims, a fact that is easily verifiable with a simple Google search).   Apparently in reference to this settlement, Viceroy recklessly and maliciously called McCormack the "$350-million-dollar man [sic]."

55.     But McCormack has steadfastly denied any involvement in the alleged kickback scheme, and was never charged or found guilty of any wrongful behavior, either in a criminal or a civil capacity.   McCormack was not even interviewed by investigators in connection with the ABH kickback inquiry because it was obvious he was not involved in any wrongdoing.   Instead, the criminal investigation into ABH yielded indictments for Todd Clawson (National Director of Federal Markets Division); Keith O'Brient (Senior Vice President, North American Sales); Charles Anthony Ezell (National Sales Director); and Nicolo Rallo (National Sales Director), all of whom pleaded guilty, and none of whom have any involvement in MiMedx.   A brief review

of the Ezell and Rallo plea agreements—both of which are publicly available in the very same or related cases to those which Viceroy cites—show that each acknowledged that the members of the kickback scheme were these four individuals, and did not identify anyone else.  Indeed, at or near the time of the ABH kickback scheme, McCormack was promoted out of his position as National Sales Director at ABH precisely in order to ensure that his ethics would not present a roadblock to the unethical activities of the other sales staff involved in the scheme.

56.     Despite the clear documentation showing Clawson, O'Brient, Ezell, and Rallo to be the wrongdoers in the ABH scheme, Viceroy barely mentioned them in its article.  No reference was made to the fact that any were even charged with a crime except Clawson, and the only statement concerning O'Brient and Ezell was that they conducted a single training session on sales (along with McCormack, which was not surprising or concerning given that at the time O'Brient was the Vice President of Sales, Ezell was the Western Sales Director and McCormack was the Eastern Sales Director).  Rallo was not mentioned at all.  These reckless and malicious omissions were a purposeful attempt to twist the facts of the ABH investigation to fit Viceroy's intended narrative that McCormack was an "instrumental figure" in the scheme, and therefore that the scheme may have carried over with him to MiMedx.  That narrative is simply false.

57.     Elsewhere in its articles, Viceroy included other statements misleadingly implying that McCormack was guilty of malfeasance, which is actionable even though Viceroy couched its statements by stating that McCormack "stood accused" of the kickback and bribery allegations at ABH, or that he was "named" as a "key influence" in the scheme.  One specific allegation Viceroy relied on to support these false suggestions is that McCormack "made false or fraudulent claims" for medical products and services to Medicare, Medicaid, and TRICARE programs from July 2008 to January 2011.  The problem with repeating such claims from the

21

ABH inquiry is that they were already investigated and no evidence was found that McCormack had any involvement with the activity in question. Viceroy knows this, or would know this had he/she done any sort of reasonable investigation, but omits this fact from the article.

58.     Viceroy also falsely implied that McCormack was somehow involved with, or was the reason for, the settlement of the allegations against ABH, stating: "While the case was settled and implies no admission of guilt we question why MiMedx has not disclosed [McCormack's] employment to investors." To be clear, McCormack settled nothing; he was not involved in any wrongdoing and has therefore never acknowledged such wrongdoing or been proven to have engaged in such wrongdoing. The mere fact that Shire settled the allegations does not in any way support the conclusion that McCormack was at all involved with the behavior alleged of the company or its other employees, particularly given the evidence showing who the actual wrongdoers were, as summarized above.

59.     Viceroy further stated that, due to the allegations concerning ABH, he/she "believe[d] McCormack's position at the company and past are a fact [sic] MiMedx would like to keep to themselves." Viceroy contended that despite McCormack's "seniority," he is featured in no MiMedx materials, does not appear on MiMedx's website, and lacks a "regular format MiMedx email address." In actuality, however, McCormack does have a regular MiMedx e-mail address, and does not have a senior position at MiMedx (he is a full five managerial levels below the CEO), making this statement entirely false. Additionally, McCormack publicly displays his MiMedx employment in prominent fashion on his public LinkedIn profile. The simple reason McCormack does not appear on MiMedx's website is that he is not a member of the executive management team. There is no basis for Viceroy's statement that MiMedx has attempted to conceal or "keep to themselves" McCormack's employment with the Company.

60.     Thus, to the extent that Viceroy stated that "our findings on Sean McCormack show a historic pattern of behavior that has proven costly to the businesses he has been employed in," or that McCormack "directed . . . inducements,"[3] Viceroy's statements were categorically false and defamatory.  To the extent that Viceroy repeated allegations made against McCormack in other contexts, Viceroy blatantly omitted the public admissions by the actual perpetrators of the kickback scheme in order to falsely imply that McCormack was somehow the responsible party, when in fact he was not.  And to the extent that Viceroy attributed wrongdoing to MiMedx based on its hiring of McCormack—and not the guilty ex-ABH employees who have never worked for MiMedx—this suggestion was also false and misleading.  Viceroy's actions toward MiMedx and McCormack were therefore defamatory and placed both in a false light.

*Channel-Stuffing Allegations*

61.     Another one of the primary claims in Viceroy's articles is that—despite the fact that several of MiMedx's former employees have abandoned their channel-stuffing allegations against the company or admitted that there is no evidence to support them—Viceroy "found evidence supporting [these allegations] in MiMedx's financial accounts."  This is a false statement, however, as no such evidence exists or is even claimed to exist.

62.     What Viceroy did state is that it uncovered an increase in MiMedx's Selling General & Administrative ("SG&A") expenses.  According to Viceroy, these expenses "are attributed to increases in sales staff, [but] do not correlate with specified increases in headcount

---

[3]     Viceroy attempted to qualify this second statement later, by stating "[w]hile the settlement is not an admission of guilt, it is worth noting that when an employee is named as the director of such a scheme it would be prudent to let the authorities know."  However, this does not make the statement any less false or defamatory.  In any event, the context of Viceroy's accusation is that MiMedx checked "no" in a certification to government agencies concerning whether a principal had been—not was alleged to be—indicted or convicted of a crime.  McCormack was not a principal of MiMedx and was not indicted or convicted of a crime.  Thus, it would have been flatly incorrect for MiMedx to check the "yes" box, as Viceroy apparently suggests it should have done based on McCormack's purported conduct.

and channel checked wages by a factor of two." Viceroy also claimed that "[a]llegations made by [ABH] employees suggest that a substantial portion of SG&A growth is attributable to kickbacks and 'sales incentives' given to VA doctors and medical supply procurement officers." What Viceroy suggests with these comments is that MiMedx's SG&A expenses evidence channel stuffing and/or illegal kickbacks because there is purportedly a discrepancy between the increase in SG&A and the increase in sales staff, and because allegations made against ABH— not MiMedx—drew a link between increased SG&A and kickbacks. However, MiMedx does not exclusively attribute SG&A to an increase in sales staff, and allegations against ABH clearly have nothing to do with MiMedx. Therefore, the entire premise of Viceroy's speculation is unsupported, rendering its implications false and misleading.

63.     Additionally, while unrelated to Viceroy's allegations concerning MiMedx's "financial accounts," Viceroy alternately attempted to support the channel-stuffing allegations in a manner similar to that which Aurelius attempted in its article. Viceroy alleged that MiMedx falsely stated on an investor call that: "We've never had a distributorship owned by employees or family of employees. The only one we have is we have a former employee that is a distributor of ours now." *Compare, supra,* ¶ 43 (Aurelius's contentions that MiMedx must be channel stuffing based on its false allegation that MiMedx distributors are controlled by "insiders").

64.     MiMedx's statement, however, was true. Viceroy disingenuously asserts that Stability Biologics ("Stability") would count as a "distributorship owned by employees or family of employees" based on a statement in MiMedx's 10-K that when it acquired Stability, there was a "related party" (related to Stability, not MiMedx) controlled by a former Stability shareholder who later became a MiMedx employee. A plain reading of the 10-K excerpt reveals that it does not rebut or contradict MiMedx's statement in any way.

*MiMedx's Government Certifications and Unrelated Lawsuits*

65.     Another frequent, but false, theme of Viceroy's articles was that MiMedx has intentionally falsified its representations to various government organizations, so as to continue to enjoy the benefits of doing business with them.

66.     For example, Viceroy implied that MiMedx violated certain compliance requirements under the System for Award Management ("SAM") with respect to the hiring of former ABH employees, by stating it had "serious reservations as to whether MiMedx properly disclosed its employees' connections" with ABH.  This portrayal is entirely misleading because MiMedx has no duty to disclose under SAM that it hired employees that were never indicted or convicted of any wrongful behavior.  There is, therefore, no basis to suggest that there was no "proper" disclosure.

67.     Viceroy also stated that MiMedx's SAM compliance(s) were certified by former employees of MiMedx who were not working at MiMedx and "had no authority" at the time of the certification, including Brent Miller and Don Ayers.  At the outset, Viceroy's claim as to Miller is simply false, as Miller still consults for the company—whether or not his LinkedIn page states that he is "retired"—and had full authority.[4]

68.     Moreover, there is a benign explanation for the purported discrepancies between the date(s) of signing and the date(s) of employment for both Ayers and Miller.  The SAM certification is submitted through a company account, which had been set up prior to Ayers' departure from the company and Miller's move to a consulting role.  Ayers was listed as the

---

[4]     Indeed, it is patently ridiculous for Viceroy to make outlandish claims of fraud against MiMedx based on nothing more than an employee's LinkedIn page.  Were Viceroy an actual journalistic outlet, it would contact MiMedx for comment before running such allegations, MiMedx would explain the issue, and nothing would come of it.  The fact that Viceroy does not follow these well-accepted journalistic practices is further evidence that it is speaking to advance its own commercial interests and those of co-conspirators, not the public interest.

company representative on the account.  When he left the company in January 2017, his responsibilities were assumed by Kimberly Durgan.  In March 2017, Durgan updated the account to replace Ayers' name with her own and published the March 27, 2017 certification with authorization from Miller (who was still a full-time employee of MiMedx).  However, Durgan had not updated the account in all necessary respects, and as a result, the March 27, 2017 certification erroneously still reflected Ayers' name.  In September 2017, Durgan realized she had not updated the representative name in all necessary respects on the company account, and fixed the error.  This effectively re-published all certifications dating back to at least 2013 with Durgan's name, including the March 27, 2017 certification, which was certified by Durgan and authorized by Miller at that time (when he was still a full-time employee of MiMedx).

69.     While the actual facts concerning the idiosyncrasies of a federal computer system are far less fanciful than the convoluted "backdating" scheme that Viceroy falsely invented, they are nevertheless true, and Viceroy would have discovered them if it had conducted any sort of reasonable investigation before publishing.

70.     Viceroy also made a separate but equally false allegation as to Ayers: that he was simultaneously employed by MiMedx and a company called Next Science, and therefore should have been disciplined or terminated for violating a purported non-compete agreement with the company.  Ayers was not, however, simultaneously employed by the two companies, as he left MiMedx in January 2017 and began working for Next Science in March 2017.  Indeed, his LinkedIn—upon which Viceroy relies exclusively for other allegations, but apparently ignores with respect to this allegation because it does not support its claim—states as much.  To the extent Viceroy bases this claim on a 2016 Next Science press release bearing Ayers' name, it is obvious that the reason it bears Ayers' name is because it was re-published in July 2017, at a

time when Ayers did work at Next Science (and not at MiMedx).  The URL for the press release cited in Viceroy's article is http://www.nextscience.com/wp-content/uploads/2016/07/Next_ Science_Acne_Gel_Press_Release_7.12.17.pdf (emphasis added).

71.    To the extent Viceroy stated that McCormack is a MiMedx "principal" as defined by the Defense Federal Acquisition Regulation Supplement ("DFARS") or Federal Acquisition Regulation ("FAR"), and therefore that MiMedx was required to disclose in certification documents that he had been indicted or convicted of a crime, this statement is false and misleading for two reasons.  First, as set forth above, McCormack was never even charged with a crime, let alone convicted of a crime.  Second, there is absolutely no basis to deem McCormack a "principal" at MiMedx.  It appears that Viceroy's support for this allegation is that he falls within that definition as a "director" at the company—i.e., MiMedx's "Director of New Market Initiatives"—but the DFARS and FAR definitions clearly use this term to mean a corporate director, which McCormack obviously is not.

72.    Viceroy also baselessly characterized the relationship between MiMedx and AvKARE, Inc. ("AvKARE") as "extremely suspicious."  AvKARE is a government distributor and Federal Supply Schedule (FSS) contractor.  Viceroy suggested that MiMedx used AvKARE's invoices to deal directly with the Department of Veterans Affairs "without certification," while utilizing MiMedx's fax number and employees.  This statement is false and misleading because MiMedx did not need "certification" and did not need to associate itself with AvKARE in order to sell products and services to the government.

73.    Viceroy then purported to observe pricing irregularities between MiMedx and AvKARE's invoices as an "attempt to conceal or draw attention away from [MiMedx's] purchase orders[.]"  Specifically, Viceroy attempted to highlight a 1-cent difference in price

between the products MiMedx sells directly, and the MiMedx products sold to the government through AvKARE. However, despite Viceroy's supposed analysis and research, Viceroy failed to note that the AvKARE prices accurately reflect, to the penny, the FSS Price without the Industrial Funding Fee ("IFF"). The pricing therefore cannot be an attempt to conceal, as it is fully accurate. MiMedx specifically negotiates for FSS Pricing with IFF, which reflects pricing ending in ".00." There is no way to "bypass manual internal control checks at VA hospitals," as Viceroy wildly speculated. Moreover, to the extent that Viceroy attempted to dramatize this issue by claiming that "[d]irect business with the Veterans Affairs hospitals is estimated to be ~25% of MiMedx's revenue in 2016, and we anticipate the VA will take action against MiMedx on the back of evidence contained in this report," its statement was again false. MiMedx's direct business with the VA was less than 10% of its revenue in 2016.

74.    Apart from the certification issues, Viceroy alleged in its September 26, 2017 article that MiMedx "[f]ailed to formally announce to the market that they are a subject of an SEC investigation," and that "[i]f they have not filed an 8-K within 4 days of becoming aware of an SEC investigation, they are in breach of withholding material information from the investing public." As noted above, however, MiMedx disclosed this information on September 21, 2017—well before the publication of Viceroy's second article. There simply was no requirement that the disclosure take the form of an 8-K filing with the SEC, contrary to Viceroy's claim. Viceroy also falsely stated that MiMedx failed to remediate a "material weakness in internal controls," when in fact MiMedx did so, and in any event there was no connection at all between the "internal controls" matter (which was tax-related) and the revenue recognition allegations leveled elsewhere in Viceroy's article. Neither of these facts, of course, kept Viceroy from falsely deeming this a "red flag" and claiming that MiMedx was an "audit risk."

75.     Finally, Viceroy mentions two unrelated lawsuits in an obvious ploy to discredit MiMedx and its CEO, without actually providing any basis to believe that there is any connection to MiMedx.  In fact, there is not.  The first of these lawsuits was not even filed against MiMedx, but against a subsidiary of Matria, the company formerly chaired by MiMedx's CEO.  MiMedx's CEO was not involved in the acquisition of that subsidiary, as he had stepped away from his role as CEO of Matria during that time period, and in any case the settlement did not at all prevent Matria from thereafter selling itself for over one billion dollars in total consideration (a welcome outcome for any investor).  The second was a class-action lawsuit filed against MiMedx in 2013 and which was settled by MiMedx's insurers controlling the matter.  MiMedx's choice would have been to go to trial and defeat the claims on their merits.  In either case, neither lawsuit has any bearing whatsoever on MiMedx's value as a company.  Viceroy's attempt to imply otherwise was knowingly misleading.

76.     Viceroy does not enjoy First Amendment protection, either for the content of its publications or to maintain its anonymity.  Viceroy's admitted short position in MiMedx stock renders its speech commercial in nature, particularly given the statements made therein.  Viceroy is not, in other words, a journalist serving the public good, but a profiteer seeking to benefit at the hands of MiMedx's shareholders by manipulating MiMedx's stock price.  Moreover, the First Amendment does not give a person the right to publish false, defamatory or misleading statements or statements which tend to place another person or entity in a false light in the public eye.

77.     Given the foregoing, Plaintiffs allege that each of the Defendants conspired to adversely manipulate the stock price of MiMedx via false, defamatory, and/or misleading statements—including statements directed specifically at McCormack—which were intended to

manipulate traders into taking a negative view of MiMedx, lower the stock price, and rescue MiMedx's short sellers from the financial catastrophe that could have resulted if MiMedx's stock price continued to rise.  Defendants' role was to act as a "shill" for bearish traders and short sellers of MiMedx stock by publishing false and misleading information—while omitting true and positive information—in an attempt to manipulate and drive the stock price down even in the face of positive performance by the company.

78.     The conspiracy among the Defendants is, among other things, evident from the fact that their false allegations closely track one another and in some instances are almost identical (*e.g.*, the statements by Fichthorn and Aurelius that "40" doctors held stock in MiMedx or its alleged affiliates).

79.     A partial list of similarities between the allegations made by Fichthorn and Aurelius is as follows:

| Fichthorn | Aurelius |
|---|---|
| Represented to MiMedx's shareholder that "this is definitely a revenue fraud situation," that the practices he described "could be a jailable offense for the CEO," and that "this situation will end up with some MiMedx employees being dragged away in handcuffs."  Expressly compared MiMedx to Arthrocare and told shareholder to think about the "Arthrocare CEO who went to jail for similar stuff." | Stated that "ArthroCare's channel stuffing was first dismissed by some investors as impacting only a small portion of its business and the CEO initially blamed short sellers before he was eventually sent to prison."  Referred to an unsubstantiated allegation against MiMedx before stating: "If you have already read the SEC's ArthroCare complaint, this allegation will sound awfully familiar." |
| Advised that "40 doctors have shares of MiMedx, which is a conflict of interest." Also purportedly talked to other doctors "getting paid in shares of Fuse Medical." | "Most notably, documents show that over 40 podiatrists across the country received membership interests in a MiMedx reseller named Fuse Medical that is linked to MiMedx affiliates." |
| Suggested that MiMedx's shareholder read the complaint filed against MiMedx | Article cites twice to *MiMedx Group, Inc. v. Harris, Kruchoski & 23 Medical,* |

| | |
|---|---|
| in Palm Beach County "for more color," and specifically cited the "channel-stuffing" case under Case No. 50-2016-CA-013806-xxxx-MB. | *LLC*, Case No. 50-2016-CA-013806-XXXX-MB (Palm Beach County, FL). |
| Alleged that Fuse was renting space from Brooks (CPM's principal), and that Brooks/CPM were Fuse's biggest supplier, although without clearly tying this purported fact to any actual allegations of wrongdoing by MiMedx. | Stated that Fuse was "registered to CPM's address and Mr. Brooks," and that CPM was the "principal supplier of Fuse," again without clearly tying this purported fact to any actual allegations of wrongdoing by MiMedx. |
| Advised MiMedx's shareholder, falsely, that he had spoken to "lots of Texas and Florida distributors who stuff product for MiMedx." | Alleged that it "found a large network of other sales entities that report storing and distributing MiMedx product, often from residential homes or obscure locations, especially in Texas. |

80.     A  partial  list  of  similarities  between  the  allegations  made  by  Fichthorn  and Viceroy is as follows:

| **Fichthorn** | **Viceroy** |
|---|---|
| Queried of MiMedx's shareholder, rhetorically, as to why MiMedx replaced its public accountant with Ernst & Young LLP if all of its claims "were true." | Stated that it finds it concerning that MiMedx proceeded to replace its auditor "in the midst of this internal control issue," while posting an image from MiMedx's Form 8-K noting the appointment of Ernest & Young LLP. |
| Discussed the FOIA requests he had purportedly sent to "several departments" of the federal government and six different VA hospitals concerning MiMedx. | Alleged that it "submitted FOIA requests to a number of government departments during the course of our due diligence process." |

81.     In addition to the foregoing, Viceroy and Aurelius both engaged in self-promotion and cross-promotional efforts online via social media (namely, Twitter) in order to promote their false and misleading articles and further manipulate the market for MiMedx's stock.  Viceroy

published and re-published its September 20, 2017 article a total of five (5) times within a 24-hour period on its Twitter page, and did the same for its September 26, 2017 article by publishing and re-publishing the article three (3) times in a 2-hour period.  Similarly, Viceroy published and re-published its October 2, 2017 article twice within a 4-minute period.  Aurelius, who has a more substantial following than Viceroy, posted each of its articles once on its Twitter page.  Moreover, the two routinely re-post and re-publish negative statements about MiMedx made on the other's Twitter page, including but not limited to the following:





82.     In sum, Defendants conspired with one another to carry out a concerted, wrongful "short and distort" campaign specifically aimed at manipulating MiMedx's stock price for their own profit.  Defendants' heinous conduct caused damages to MiMedx, along with its employees and investors.  Viceroy's conduct, in particular, defamed McCormack, causing him reputational and other harms.  Based on these allegations, Plaintiffs assert the following claims.

## FIRST CLAIM FOR RELIEF

### LIBEL

### (By MiMedx Against Sparrow, Viceroy, and all Doe Defendants)

83.     MiMedx realleges and incorporates herein, by this reference, all of Plaintiffs' foregoing allegations.

84.     Those statements by Aurelius (*i.e.*, Sparrow) and Viceroy in their respective articles identified above as false constituted actionable libel.

85.     Aurelius and Viceroy's statements were false and malicious, defamatory of MiMedx, published on the internet, injured MiMedx's reputation and tended to expose MiMedx to negative views.  MiMedx has suffered damages as a result of Aurelius and Viceroy's libelous statements, including attorneys' fees.

86.     Aurelius and Viceroy's wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

87.     For this alleged conduct, MiMedx seeks preliminary and permanent injunctive relief against Sparrow and Viceroy and damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### LIBEL

### (By McCormack Against Viceroy and all Doe Defendants)

88.     McCormack realleges and incorporates herein, by this reference, all of Plaintiffs' foregoing allegations.

89.     Those statements by Viceroy in its articles concerning McCormack, identified above as false, constituted actionable libel.

90.     Viceroy's statements were false and malicious, defamatory of McCormack, published on the internet, injured McCormack's reputation and tended to expose McCormack to negative views.  McCormack has suffered damages as a result of Viceroy's libelous statements, including attorneys' fees.

91.     Viceroy's wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

92.     For this alleged conduct, McCormack seeks preliminary and permanent injunctive relief against Viceroy and damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### SLANDER

### (By MiMedx Against Dialectic, Fichthorn, and all Doe Defendants)

93.     MiMedx realleges and incorporates herein, by this reference, all of Plaintiffs' foregoing allegations.

94.     Those statements by Fichthorn—whether made on behalf of himself or Dialectic—in his September 15, 2017 oral conversation with MiMedx's shareholder identified above as false constituted actionable slander.

95.     Fichthorn's statements were false and malicious and made charges against MiMedx with respect to its trade, office, or profession, which upon information and belief were calculated to injure MiMedx in the manner described herein.

96.     Fichthorn's wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

97.     For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Dialectic and Fichthorn, and damages in an amount to be proven at trial.

## FOURTH CLAIM FOR RELIEF

### DEFAMATION

### (By MiMedx Against All Defendants and Doe Defendants)

98.     MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

99.     Defendants' conduct herein, and specifically, those statements by Fichthorn in his September 15, 2017 conversation with MiMedx's shareholder and by Aurelius and Viceroy in their respective articles, identified above as false, constituted actionable defamation.

100.    Defendants' statements were malicious, unprivileged and defamatory, transmitted to the public with fault amounting to at least negligence, and caused harm to MiMedx.

101.    Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

102.    For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### DEFAMATION

### (By McCormack Against Viceroy and Doe Defendants)

103.    McCormack realleges and incorporates herein, by this reference, all of Plaintiffs' foregoing allegations.

104.    Viceroy's conduct herein, and specifically, those statements by Viceroy identified above as false constituted actionable defamation.

105.    Viceroy's statements were malicious, unprivileged and defamatory, transmitted to the public with fault amounting to at least negligence, and caused harm to McCormack.

106.    Viceroy's wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

107.    For this conduct, McCormack seeks preliminary and permanent injunctive relief against Viceroy and damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### FALSE LIGHT

### (By MiMedx Against All Defendants and Doe Defendants)

108.   MiMedx realleges and incorporates herein, by this reference, all of its foregoing allegations.

109.   Defendants' conduct herein wrongfully placed MiMedx in a false light in the public eye under Georgia law.  Defendants made misleading statements (*e.g.*, those which purposely omitted facts or context tending to be favorable to MiMedx, a corporation based in Georgia, or made suggestions concerning MiMedx that ran counter to the actual facts known by Defendants).  Defendants did so purposely, in order to diminish MiMedx's standing with the public and manipulate the market for MiMedx's stock.  The false publicity created by Defendants' wrongful conduct is highly offensive to a reasonable person.

110.   Furthermore, there was absolutely nothing "newsworthy" about Defendants' allegations and innuendo.  In fact, upon information and belief, the reason that Defendants made such false and misleading allegations was simply to adversely manipulate MiMedx's stock price, rather than provide any sort of journalistic service to the public at large.  As a result, this case does not implicate "the right of the public to know."

111.   Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

112.   For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

#### (By MiMedx Against All Defendants and Doe Defendants)

113.    MiMedx realleges and incorporates herein, by this reference, all of Plaintiffs' foregoing allegations.

114.    Prior to Defendants' conduct, MiMedx enjoyed a profitable business relationship with various third parties, including customers, investors, and creditors.

115.    Defendants' conduct herein was tortious, malicious, and independently wrongful for the reasons described above.

116.    Defendants acted with the sole purpose of harming MiMedx or used unfair, dishonest, or improper means to interfere with the business relationship between MiMedx and various third parties.

117.    Defendants' publications caused these third parties, to end their business relationship with MiMedx or fail to enter into anticipated business relationships with MiMedx, which proximately damaged MiMedx.    But for Defendants' conduct, MiMedx's business relationships would have continued for the foreseeable future.

118.    Defendants' wrongful statements are commercial speech that does not enjoy First Amendment protection from the claims asserted herein.

119.    For this conduct, MiMedx seeks preliminary and permanent injunctive relief against Defendants and damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.      That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be preliminarily and permanently enjoined from making any further false or misleading statements concerning Plaintiffs, or statements tending to place Plaintiffs in a false light;

B.      That Defendants, and all of their respective officers, agents, servants, representatives, employees, attorneys, parent and subsidiary corporations, assigns and successors in interest, and all other persons acting in concert with Defendants, be preliminarily and permanently enjoined from any other wrongful, defamatory, or misleading conduct discovered during the course of this action;

C.      That Plaintiffs be awarded compensatory and punitive damages in an amount according to proof at trial;

D.      That Plaintiffs be awarded their reasonable attorneys' fees and costs for prosecuting this action; and

E.      That Plaintiffs be granted such further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby respectfully demand a trial by jury of all issues triable of right by a jury.


Dated:  October 4, 2017

/s/ Daniel L. Brown
Daniel L. Brown (DB-0906)
dlbrown@sheppardmullin.com
Thomas M. Monahan (TM-1984)
tmonahan@sheppardmullin.com
SHEPPARD MULLIN RICHTER &
HAMPTON LLP
30 Rockefeller Plaza
New York, NY 10112
Tel: 212-653-8700

Joseph D. Wargo (GA No. 738764)
(*Pro Hac Vice to be filed*)
jwargo@wargofrench.com
David M. Pernini (GA No. 572399)
(*Pro Hac Vice to be filed*)
dpernini@wargofrench.com
WARGO & FRENCH LLP
999 Peachtree St. NE, Floor 26
Atlanta, GA 30309
Tel: 404-853-1500; Fax: 404-854-1501

*Counsel for Plaintiff MiMedx Group, Inc.*

/s/ Daniel J. Horowitz
Daniel J. Horwitz (DH-4339)
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
dhorwitz@mclaughlinstern.com
Tel: (212) 448-1100; Fax: (212) 448-0066

*Counsel for Plaintiff Sean McCormack*